## PETERS v. MALIN.

### (Circuit Court, N. D. Iowa, E. D.   October 21, 1901.)

1. JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION—ACTION INVOLVING RIGHTS OF TRIBAL INDIANS.

The foundation of an action for false imprisonment is the fact that such imprisonment was brought about by the issuance and enforcement of void or irregular process; and where the plaintiff is a tribal Indian, and the wrong complained of is his arrest and imprisonment under process issued by a state court, for the violation of a state law to which it is alleged he was not subject, the issue whether such process was void or not depends primarily upon questions arising under the laws and treaties of the United States, and a federal court has jurisdiction of the action.[1]

2. INDIANS — AUTHORITY OF UNITED STATES OVER TRIBAL INDIANS — RESERVATIONS.

The Indians of the Sac and Fox tribe residing in Tama county, Iowa, on lands purchased by them with the consent of the state, and held in trust for their benefit, are tribal Indians, and their lands constitute a reservation under the control of the United States in all matters pertaining to the domestic relations of such Indians. Such right of control in the general government arises from its relation to all the tribal Indians, as such, and is not dependent upon the title to the land upon which they reside.

3. SAME—SAC AND FOX TRIBE IN IOWA—STATE JURISDICTION OVER.

A court of the state of Iowa has no jurisdiction to appoint a guardian for the persons of minors of the Sac and Fox tribe of Indians who reside on the reservation of the tribe in Tama county; and an order making such an appointment, and directing the guardian to place and keep his wards in the industrial school established by the United States, thus removing them from the reservation and from the immediate control of their parents and relations, was void, and conferred no authority upon the guardian over such minors.

4. SAME—CRIMINAL STATUTES OF STATE.

The state of Iowa, by Act February 14, 1896 (Acts 26th Gen. Assem. p. 114) c. 110, § 1, tendered to the United States "exclusive jurisdiction of the Sac and Fox Indians residing in Iowa and retaining the tribal relation * * * and of all lands now or hereafter owned by or held in trust for them as a tribe," and further provided that "as soon as the United States shall accept and assume such jurisdiction all such juris-

---

[1] Federal question as ground of jurisdiction, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore Purchasing Co. v. Boston & M. Consol. Copper & Silver Min. Co., 35 C. C. A. 7.

diction on the part of the state of Iowa shall cease." By section 3 certain reservations were made,—among others, that nothing in the act should prevent the courts of the state from exercising jurisdiction of crimes against the laws of the state committed on such lands either by said Indians or others, or of such crimes committed by said Indians in any part of the state. The cession was accepted by act of congress. *Held*, that such reservation did not subject such Indians to the criminal laws of the state, except for offenses committed against white persons, or reserve to the state any jurisdiction or control over the domestic affairs or relations of the Indians, which would practically nullify the purpose of the act as declared in its first section, and which jurisdiction the state in fact never possessed.

5. SAME—ILLEGAL PROSECUTION—LIABILITY FOR FALSE IMPRISONMENT.

Plaintiff, a member of the Sac and Fox tribe of Indians, residing on their reservation in Iowa, assisted an Indian woman who was also a member of the tribe in removing her minor children from the reservation to prevent their being compelled forcibly and against her wishes to remain in attendance at the Indian school, which was some distance from the reservation. Defendant, who was the agent for the tribe, and who had also been appointed by a district court of Iowa guardian of such minors, caused plaintiff to be arrested; and he was held to the grand jury, indicted, and imprisoned pending his trial in the state court for violation of Code Iowa, § 4761, which makes it an offense to take, decoy, or entice away any child under the age of 15 years, with intent to detain or conceal such child from its parent, guardian, or other person having lawful charge thereof. *Held*, that such provisions had no application to the acts of plaintiff, all parties to the transaction being tribal Indians, and the defendant having no lawful authority over the minors by virtue of his void appointment as guardian; that the state court was without jurisdiction to try or punish plaintiff under such statute for the acts committed by him, and the action of defendant, therefore, constituted a false imprisonment, for which he was liable in damages.

6. FALSE IMPRISONMENT—INADEQUACY OF DAMAGES AWARDED—NEW TRIAL.

Plaintiff, a tribal Indian, was confined in jail some nine days while awaiting trial in the state court, in which he was acquitted by direction of the court. There was no actual malice on the part of defendant, who caused the false imprisonment, and no ground for the recovery of anything beyond compensatory damages. *Held*, that a verdict awarding $10 damages, while smaller than should have been rendered, would not be set aside, in view of the improbability that a verdict would be secured on a second trial for an amount sufficiently greater to compensate plaintiff for the additional expense.

Action at Law for False Imprisonment. On motions for new trial filed on behalf of plaintiff and defendant. See 104 Fed. 849.

J. W. Lamb and Wm. G. Clark, for plaintiff.

Caldwell & Walters, Struble & Stiger, and H. G. McMillan, for defendant.

SHIRAS, District Judge. This action was brought by the plaintiff, who is a member of the tribe of Indians settled in Tama county, Iowa, against the defendant, who is the agent appointed by the United States and placed in charge of the tribe, to recover damages for a false imprisonment of the plaintiff. The case was tried before a jury at the September term of the court at Cedar Rapids, and a verdict awarding the plaintiff damages in the sum of $10 was returned by the jury, and now both parties move for a new trial. It will probably conduce to a better understanding of the questions

presented by the motions to give a brief recital of the dealings of the state and national governments with these Indians:

The Indians settled in Tama county are a remnant of the once powerful combined tribe of Sacs and Foxes, who at an early day occupied a large part of the territory now forming the state of Iowa. Under date of October 11, 1842, a treaty was entered into between the United States and the confederated tribes of Sacs and Foxes by which the latter ceded to the former all their interest in the lands west of the Mississippi river in consideration of the payment to be made by the United States of the sums of money named in the treaty, and upon the promise of the government to assign to the Indians a suitable tract of land upon the Missouri river or some of its tributaries. 7 Stat. 596. In accordance with the terms of this treaty a reservation was assigned to the Indians within the territory now forming the state of Kansas, and the large majority of the Indians removed to the land assigned them, leaving, however, a few individuals who clung to their old homes in Iowa, the number so remaining being increased by others who returned to Iowa. The government of the United States endeavored to compel these Indians to follow the tribes into Kansas, by refusing to pay them their share of the annuities due under the terms of the treaty unless they would join their brethren in Kansas, but without avail. In 1856 the legislature of the state of Iowa adopted an act declaring:

"That the consent of the state is hereby given that the Indians now residing in Tama county, known as a portion of the Sacs and Foxes, be permitted to remain and reside in said state, and that the governor be requested to inform the secretary of war thereof, and urge on said department the propriety of paying said Indians their portion of the annuities due or to become due to said tribes of Sacs and Foxes." Acts 5th Gen. Assem. (Ex. Sess.) c. 30.

In 1857 the Indians bought 80 acres of land in Tama county, which was the beginning of their present settlement, and there has been added thereto since that date some 3,000 acres; the title to part being taken in the name of the governor of Iowa, and the remainder in the name of the secretary of the interior, but all being held in trust for the Indians, whose numbers are now about 400. Since 1867 the government has paid to these Indians their proportionate share of the annuities coming to the Sacs and Foxes, and for years has maintained an agent upon the land in charge of their affairs. As the number of the children in the settlement increased, it was deemed desirable to make provision for their education, and to that end, among others, the state of Iowa, by an act of the general assembly approved February 14, 1896, ceded to the United States exclusive jurisdiction over the Sac and Fox Indians residing in Iowa, which cession was accepted by the United States in the act of congress approved June 10, 1896; and at the same time congress appropriated the sum of $35,000 for the purchase of a site and the erection of the necessary buildings for an Indian industrial school, which was located and erected at Toledo, in Tama county, not upon the Indian lands or reservation, but some four or five miles therefrom. After the erection of the school buildings, efforts

were made by the Indian agent and the school superintendent to secure the attendance of the Indian children; but much opposition thereto was manifested by the Indian parents, who evidently became impressed with the idea that the purpose of the school was to convert the children from the Indian modes of thought and living to those of the white men, and therefore the Indians would not consent to the taking of the children from their homes on the reservation and keeping them at the school at Toledo. In this situation of affairs, a plan was devised for securing the appointment of the defendant, Malin, as the guardian of the persons of the Indian children; and, upon application made, the district court of Tama county, Iowa, appointed the defendant guardian of some 15 to 20 of these children, and directed him, as such guardian, to place and keep these children at the industrial school, and the defendant thus by compulsion placed a number of them in the school. Subsequently two of these children ran away from the school, going to their homes on the reservation, and thereupon the mother of one of them, in order to prevent their being recaptured and forcibly returned to the school, determined to take them away from the reservation, and to that end arranged with plaintiff that he should accompany her and the children to the home of a white man named Ruhl, living in Poweshiek county, in order to drive the wagon that was to convey them, and to act as interpreter in arranging for the board and care of the children. The plaintiff thus aided in taking the children to the place named, and upon his return he was arrested upon an information sworn to by the defendant, and taken before a justice of the peace, charged with the crime of enticing away a child under 15 years from the Indian reservation and keeping her in hiding; the information being based upon section 4761 of the Code of Iowa, which enacts that:

"If any person maliciously, forcibly or fraudulently lead, take, decoy or entice away any child under the age of fifteen years, with intent to detain or conceal such child from its parent, guardian or other person having lawful charge thereof, he shall be imprisoned in the penitentiary not more than ten years or be fined not more than one thousand dollars or punished by both such fine and imprisonment."

Upon the hearing before the justice the plaintiff was held to answer before the grand jury of the state court, and by that body was indicted; and, being brought to trial before the court and petit jury, by direction of the court a verdict of not guilty was returned. During the pendency of these proceedings the plaintiff was imprisoned in the county jail for a period of some nine days, and after the dismissal of the case in the state court the plaintiff brought this action in this court to recover damages caused him by his imprisonment in the county jail. The case was originally brought against Wm. G. Malin, the Indian agent, and J. W. Nellis, the superintendent of the Indian school, but was subsequently dismissed as to the last-named party, and therefore the questions will be considered the same as though he had never been named as a party defendant.

The defendant, Malin, filed a demurrer to the petition on the ground that this court could not take jurisdiction of the case, for

the reason that the controversy was not between citizens of different states, and the cause of action was not based upon any provision of the constitution, laws, or treaties of the United States. The demurrer was overruled, and thereupon an answer and an amended answer were filed, and upon the issues thus presented the case was heard before a jury, a verdict for plaintiff in the sum of $10 being returned; and now the defendant moves for a new trial upon numerous grounds, the first of which is that this court has not jurisdiction over the case, it being contended that false imprisonment is a cause of action at the common law, and does not arise under the provisions of the constitution, laws, or treaties of the United States.

To sustain an action of false imprisonment, it must be shown that the party complaining was arrested and imprisoned without warrant of law, or upon void process. Thus, in Bryan v. Congdon, 86 Fed. 221, 29 C. C. A. 670,—a case decided by the court of appeals for this circuit,—it is ruled that:

"The established law lying at the foundation of this action is that if a person has been arrested and imprisoned under color of legal process, which is thereafter set aside for irregularity, the person who set the process in motion is responsible in damages to him upon whom the indignity and deprivation of liberty have been visited. Where the process is set aside for mere error committed by the court in the progress of the action, in contradistinction to irregular or void process, no responsibility may attach to him who caused its issue; but, when it is vacated because it was irregular in its inception, responsibility at once attaches. 'In the one case a man acts irregularly and improperly, without the sanction of any law, and he therefore takes the consequences of his own unauthorized act. But, where he relies on the judgment of a competent court, he is protected.' * * * The whole doctrine is concisely summed up in Day v. Bach, 87 N. Y. 56–60, and in Fischer v. Langbein, 103 N. Y. 84, 8 N. E. 251, substantially as follows: He who causes void or irregular process to be issued, whereby injury comes to another against whom it is enforced, is liable in damages therefor. Where the process is void, the right of action for the injury attaches when the wrong is committed, and no judgment vacating the process is required. * * * Void process is defined to be such as was issued without power in the court to award it, or which the court has not acquired jurisdiction to issue in the particular case, or which fails in some material respect to comply with the requisite form of legal process."

While, therefore, it is true, as claimed, that the right to maintain an action for false imprisonment is of common-law origin, nevertheless the foundation of the action is the fact that the imprisonment was brought about by the issuance and enforcement of void process; and in the case now before the court the issue whether the process under which plaintiff was imprisoned was void or not depends primarily on questions arising under the laws and treaties of the United States. In the petition filed by plaintiff it is averred that the plaintiff is a tribal Indian; that the defendant is the United States agent, acting under the authority of the federal government; that the defendant well knew that the plaintiff, as a tribal Indian, was not subject to the laws of the state of Iowa; and that he wrongfully and maliciously charged plaintiff with a violation of a state law, and caused his arrest and imprisonment upon such charge. In the answer of defendant, after reciting the proceedings taken against the plaintiff, it is further stated:

"That the said Wm. G. Malin, in causing the arrest of the said Indian, Peters, by reason of the matters aforesaid, acted in harmony with the desire and authority of the government in that regard, all of which acts were approved by the government as being strictly in the line of the duty of the said W. G. Malin as agent aforesaid, as prescribed by law and the rules of the Indian school service; and these defendants aver that said child at the time of the wrongful matters herein alleged was under fifteen years of age; and these defendants further allege that prior to the wrongs alleged to have been committed by him, the said W. G. Malin, against the said plaintiff, he, the said Malin, had been duly appointed by the district court of Tama county, Iowa, as the guardian of the said child, Ma-sqa-sec, and was such guardian at the time of said alleged wrongs, and that in regard to all the actions taken by him to secure the attendance of said child at said school, and in causing the arrest of the said Peters for enticing her away. he, the said Malin, was acting in the interests of said child, as guardian of her person, and as the agent of the tribe, representing the United States government, and in accordance with his duty, as he understood it, as such agent and guardian."

It is thus averred that the defendant in taking proceedings against the plaintiff was acting in the capacity of Indian agent appointed under the laws of the United States, and as guardian of the person of the Indian child. It cannot be questioned that the power possessed by the defendant as Indian agent, and whether in the exercise thereof he was justified in causing the arrest and imprisonment of the Indian plaintiff, are questions arising solely under the laws and treaties of the United States. As to the averment that the defendant was also acting as guardian of the person of the Indian child, under an appointment made by the district court of Tama county, Iowa, the material question presented thereby is whether the laws of the state providing for the appointment of guardians for minor children are applicable to the children of the tribe of Indians living in Tama county; and this inquiry involves the questions whether these Indians are tribal Indians, wards of and dependent upon the national government, and, if so, whether they are within the plane of the ordinary laws of the state regulating the domestic affairs of its citizens. The question whether these Indians are tribal Indians is one which must be determined by the laws and treaties of the United States; for, as is said by the supreme court in Elk v. Wilkins, 112 U. S. 94–100, 5 Sup. Ct. 41, 44, 28 L. Ed. 643, 645:

"The alien and dependent condition of the members of the Indian tribes could not be put off at their own will, without the action and assent of the United States."

So, also, the question of the right of the state court to appoint a guardian for the persons or property of the minor Indian children residing on the reservation must be solved by a construction of the acts of the United States with reference to these Indians; for, so long as the tribe (and that term includes minors and adults) remains under the control of the national government, the state cannot undertake the control of the persons and tribal property of the Indians. Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483; U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228. Under any view, therefore, that can be taken of the issues presented in this case, it must be held that the case is one arising under the laws and treaties

of the United States, and of which the court has full jurisdiction, irrespective of the fact that the plaintiff cannot be said to be a citizen of a state of the Union.

The next position taken in support of the motion for a new trial is that the court erred in holding that the criminal laws of the state of Iowa were not applicable to these Indians in their relations with each other, nor did these laws control the domestic relations and duties of the Indians. It is not questioned by the defendant that these Indians are tribal Indians, and properly under the charge of the government of the United States; but it is contended that the land occupied by them cannot be deemed to be an Indian reservation, because the title thereto is vested in the governor of the state and the secretary of the interior in trust for the Indians, and was purchased by the Indians after the admission of Iowa into the Union. The relation of dependency existing between tribal Indians and the national government does not grow out of the ownership of the land, either by the Indians or the government, but, as is said by the supreme court in U. S. v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228:

"These Indian tribes are the wards of the nation. They are communities dependent on the United States. * * * From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive and by congress and by this court whenever the question has arisen. * * * The power of the general government over these remnants of a race once powerful, now weak and diminishing in numbers, is necessary to their protection, as well as the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

So long as these Indians retain their tribal relation and continue to be wards of the national government, the control and management of them with respect to their tribal affairs is in the federal government, irrespective of the question of the title of the lands upon which for the time being they may be located. Thus, if the United States should, with the consent of the state, now purchase or lease certain lands from private owners in the state of Iowa for the purpose of furnishing a home for a body of tribal Indians, and should remove the Indians thereto, placing them in charge of an Indian agent, is it not clear that the lands thus occupied would be in fact and in law an Indian reservation? The extent of the control of the state over the lands thus occupied is to be determined by the facts of the particular case; but if it be true that in a given case the state may have reserved to itself the right to build roads through the premises, to execute judicial process thereon, and to punish crimes committed thereon against the citizens of the state, these reservations will not change or affect the status of the Indians as tribal wards of the nation, nor prevent the land occupied by them from being properly denominated an Indian reservation. In the case at bar the lands in Tama county were bought for the benefit of the Indian tribe, the title

being taken in the name of the governor of Iowa and of the secretary of the interior, to be by them held in their official capacity in trust for the Indians. The consent of the state to the purchase of these lands for the benefit of the Indians as a tribe, and to their location thereon, is shown by the act of the general assembly adopted in 1856, consenting to these Indians remaining in the state, by the action of the governor in holding the title of the lands in trust for the Indians, and by the act of the general assembly adopted February 14, 1896 (Acts 26th Gen. Assem. p. 114), ceding jurisdiction to the United States over the Indians and all lands owned by them or held in trust for them. In view of these facts, it must be held that the Indians residing in Tama county are tribal Indians residing on lands purchased for their benefit with the consent of the state, which lands constitute a reservation under the control of the United States in all matters pertaining to the domestic relations of the Indians, and, furthermore, that their status as tribal Indians is not based upon the act of the general assembly of Iowa just cited, but grows out of the fact that they are a part of the confederated tribes of Sacs and Foxes, between whom and the national government the relation of wards or dependents had been recognized and existed long before the state of Iowa was organized, and which condition of dependency has never been changed by any act of the national government.

This being the status of these Indians, then the question arises as to the applicability of the laws of the state of Iowa to them. On the trial of the case the court instructed the jury that the laws of the state providing for the appointment of guardians for the persons and property of minors did not apply to the Indian children living on the reservation, and therefore that the action of the district court of Tama county in appointing the defendant guardian of the persons of the Indian children was nugatory and without legal right to sustain it. The correctness of this ruling is now challenged. This question was before me in the case of In re Lelah-puc-ka-chee (D. C.) 98 Fed. 429, and it was therein held that the provisions of the Code of Iowa authorizing the appointment of guardians of minors did not apply to the tribal Indians of Tama county, and I see no reason for changing the rule therein made. As pointed out in that case, if the provisions of the Code of Iowa with respect to the appointment of guardians is in force in this tribe, then the provisions of the Code with respect to appointing administrators for the estates of deceased Indians would also be applicable, and thus. inextricable confusion would result in the administration of the domestic affairs of the Indians. It is apparent that, if the various provisions of the laws of Iowa are to be held applicable to these Indians and their property, then their tribal condition will be speedily broken up, not in pursuance of the acts of the national government, but through the enforcement of the laws of the state, acting upon the persons and property of the Indians. If the district court of Tama county had the right to appoint the defendant the guardian of the persons of the Indian children, it can appoint any competent person to the position; and if, in its judgment, it deemed it advisable, it could direct the placing

these children in any of the schools of the state. In Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, it is held that with respect to "a member of an Indian tribe, whose tribal organization was still recognized by the government of the United States, the right of inheritance in his land at the time of his death was controlled by the laws, usages, and customs of the tribe, and not by the law of the state of Minnesota, nor by any action of the secretary of the interior." In this case the supreme court cite approvingly the decision of the supreme court of Minnesota in U. S. v. Shanks, 15 Minn. 369 (Gil. 302), wherein it was held that a probate court of the state had no jurisdiction over the estate of a chief of a tribe of Chippewa Indians to whom a section of land had been patented by the United States in pursuance of the terms of a treaty with the tribe. Although these Indians reside within the territorial limits of the state of Iowa, they are, so far as their ordinary life is concerned, without the plane of the legislative jurisdiction of the state; and therefore the act of the district court of Tama county in appointing the defendant the guardian of the persons of the Indian children, and directing him to place and keep them in the industrial school at Toledo, thus removing the children from the immediate control of their parents and relatives, and removing them from the reservation where their families resided, was an act without law to support it, and conferred upon the defendant no authority whatever over the persons of the Indian children.

Upon the trial the court further charged the jury that section 4761 of the Code of Iowa, which enacts that any person who decoys or entices away any child under the age of 15 years with intent to detain or conceal such child from its parent, guardian, or other person, having lawful charge thereof, shall be punished by fine and imprisonment, was not applicable to the plaintiff in his dealings with the Indian children, he being a member of the Indian tribe. It is contended that though it may be true generally that the criminal laws of the state are not applicable to tribal Indians living therein, with respect to their dealings with each other, yet in this particular case the criminal laws of the state are binding upon the Indians by reason of the provision of the act of the general assembly already cited, approved February 14, 1896 (Acts 26th Gen. Assem. p. 114). To fairly present the question, it may be advisable to cite at length the provisions of this act, they being as follows:

"Chapter 110. Be it enacted by the general assembly of the state of Iowa.

"Section 1. That, except as hereinafter provided, exclusive jurisdiction of the Sac and Fox Indians residing in Iowa and retaining the tribal relation, and of all other Indians dwelling with them, and of all lands now or hereafter owned by or held in trust for them as a tribe, be and the same is hereby tendered to the United States, and that, as soon as the United States shall accept and assume such jurisdiction, all such jurisdiction on the part of the state of Iowa shall cease.

"Sec. 2. Consent is hereby given to the United States to purchase any land in Tama county to be used for and in connection with any school or schools to be established and managed by federal authority for the education of said Indians.

"Sec. 3. Nothing contained in this act shall be so construed as to prevent on any of the lands referred to in this act, the service of any judicial pro-

cess issued by or returnable to any court of this state or judge thereof, or to prevent such courts from exercising jurisdiction of crimes against the laws of Iowa committed thereon either by said Indians or others, or of such crimes committed by said Indians in any part of this state, or to prevent the establishment and maintenance of highways and the exercise of the right of eminent domain under the laws of this state over lands now or hereafter owned by or held in trust for said Indians, or to prevent the taxation of said lands for state, county, bridge, county road, and district road purposes, and such other purposes as the general assembly may from time to time by special statute provide."

The contention of defendant is that the provisions of section 3 reserve to the state jurisdiction over all criminal violations of the laws of Iowa committed on or off the reservation by the Indians, and that this must be construed to keep within the jurisdiction of the state the Indians as well as the lands of the reservation. If this construction is given to section 3, it will result in practically nullifying all that is granted in section 1. It is a settled rule of construction that all parts of the act must be considered, having due regard to the general purpose sought to be accomplished by the passage of the act, and a literal construction of particular clauses will not be adopted if the effect thereof would operate against the manifest purpose of the legislature. Scott v. Latimer, 89 Fed. 843, 33 C. C. A. 1; Heydenfeldt v. Mining Co., 93 U. S. 634, 23 L. Ed. 995; Kohlsaat v. Murphy, 96 U. S. 153, 24 L. Ed. 844. The general purpose of the act in question is clearly shown by the provisions of the first section, which in effect declares that exclusive jurisdiction over the Sac and Fox Indians residing in Iowa and retaining the tribal relation, and of all the lands owned by them or held in trust for them, is tendered to the United States. The purpose of this section was to relinquish to the United States any and all jurisdiction over the Indians and their property which it might be claimed existed in the state, to the end that the control of these Indians in their tribal condition should be wholly vested in the national government. As already said, I do not believe that these Indians had ever ceased to be tribal Indians, or had ever passed from under the control of the federal government; but the passage of this act by the general assembly of Iowa, and the acceptance of its terms by the national congress, served to put at rest any possible doubts that might arise with respect to the status of these Indians; and certainly it cannot be true that since the passage of this act there remains in the state any control over the domestic affairs or relations of these Indians, including the education of the children, the control of the parents or relations over them, and all other matters that pertain to their relations with each other as members of the tribe. If any of the provisions of the statutes of Iowa, such as those that provide for the appointment of guardians for the persons and property of minors, are held applicable to these Indians, then all of the provisions of the state laws must be applicable, for there is no ground for holding that part of the laws are applicable and part not; and such a ruling would practically nullify the exclusive jurisdiction over the affairs of these Indians, which it was clearly the purpose of the first section of the act of the general assembly to confer upon the national government. But as it was

clearly contemplated that these Indians would continue to reside as a tribe upon their lands in Tama county, and would be brought in some respects into contact with the people of Iowa, it was deemed wise and proper to reserve, for the protection of the latter, jurisdiction in certain particulars over the lands of the reservation, and jurisdiction to punish crimes against the people of Iowa; and these are the purposes of section 3 of the act, which reserves to the state the right to tax the lands, to construct highways across the same, to execute legal process thereon, and jurisdiction in the courts of the state over crimes against the laws of Iowa committed on the reservation by Indians or others, or by Indians in any part of the state. It may be, as claimed, that under this section jurisdiction exists in the courts of the state over acts forbidden by the criminal laws of the state, committed by an Indian against the person or property of one who is within the protection of the laws of Iowa, for in such case the act done violates the rights secured to the citizen or resident of Iowa; but, to sustain the jurisdiction in such cases, it must appear that the Indian occupied a position or relation that brought him within the plane of the legislative jurisdiction of the state. It is well settled with respect to the citizens of the states that they are not within the plane of state jurisdiction when acting in some relation or with respect to some matter which is wholly within the jurisdiction of the national government. This seeming anomaly results from the fact that we live under a dual government, and therefore in determining whether, under given circumstances, a person can be rightfully charged with a violation of a law of the state, regard must always be had to the question, whether, in doing the act complained of, the person charged was acting within the plane of the legislative jurisdiction of the state. Thus, in Re Loney, 134 U. S. 372, 10 Sup. Ct. 584, 33 L. Ed. 949, it was held that the laws of a state punishing perjury were not applicable to parties testifying in cases of contested congressional elections, or in proceedings under national bankrupt acts, or in matters connected with the public lands. In Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648, wherein a deputy collector of internal revenue was assaulted while engaged in the performance of his duty, and in self-defense killed one of his assailants, it was held that he could not be brought to trial in the state court. In the celebrated case of In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, it was held that, in taking the life of Terry in defense of Justice Field, Neagle was acting under the authority of the law of the United States, and that he was "not liable to answer in the courts of California on account of his part in that transaction." In the matter of In re Waite (D. C.) 81 Fed. 359, it was held that the criminal laws of the state of Iowa were not applicable to a pension examiner appointed under the laws of the United States, with reference to acts done in connection with his duties as examiner. In Ohio v. Thomas, 173 U. S. 276, 19 Sup. Ct. 453, 43 L. Ed. 699, it was held that the governor of a national soldiers' home in Ohio could not be prosecuted under a state statute regulating the use of oleomargarine, for including this article in the supplies used in the home; it being said:

"Whatever jurisdiction the state may have over the place or ground where the institution is located, it can have none to interfere with the provision made by congress for furnishing food to the inmates of the home; nor has it any power to prohibit or regulate the furnishing of any article of food which is approved by the officers of the home, by the managers, and by congress. Under such circumstances the police power of the state has no application."

The state of Iowa has the right to exercise its police powers for the protection of its own citizens, but it cannot regulate the affairs of the tribal Indians in their relations to each other, for in these relations the Indians are under the control and protection of the national government. Therefore, in determining whether the Indian, Peters, acted in violation of law in aiding in the removal of the Indian children from the reservation in order to prevent their return to the industrial school,—an act which did not affect any citizen or resident of Iowa other than the Indians,—the question is whether he was then within the plane of and subject to the laws of the state of Iowa. Is it within the power of the state to regulate the conduct of the industrial school at Toledo? Can the general assembly of the state, by special or general legislation, define what shall be taught in the school, or how the inmates shall be fed or clothed, or at what age the scholars shall be admitted? Can the general assembly make it the duty of the Indian parents to send their children to the school, and punish them if they fail so to do? Can it provide for the punishment of children who refuse to attend or escape therefrom? If it be true, as it undoubtedly is, that this school is one created and maintained by the national government for the benefit of these tribal wards of the nation, it must be true that the control of the school is wholly within the jurisdiction of the federal government, and wholly without the legislative jurisdiction of the state. The same is true of the Indians in all their tribal relations to each other and to the national government. With respect to these relations the Indians cannot be subject at one and the same time to the legislative jurisdiction of the state and nation, and, in the absence of action on part of the national government making applicable to the Indians given parts of the laws of the state, it must be held that the legislation of the state is not applicable to the affairs of the Indian tribe in their relations to each other and to the federal government.

It was upon this view of the relation between these tribal Indians and the governments of the state and nation, that upon the trial the jury were instructed that the provisions of the state Code providing for the appointment of guardians for the persons and property of minor children had no application to Indian children living on this reservation, and therefore that the district court of Tama county had no authority to appoint the defendant, Malin, the guardian of the persons of the Indian children, and that such void appointment gave him no authority to remove these children from their homes on the reservation, contrary to the wishes of their parents and relatives, and compel their attendance at the industrial school, and that in aiding the mother of Lelah-puc-ka-chee in taking these children away from the reservation the plaintiff did not violate the provisions of section

4761 of the Code of Iowa, for the reason that this section is not applicable to these Indians, and it does not confer upon the courts of the state the right to try, convict, and punish an Indian for such acts as were proven against the plaintiff. If these views of the law applicable to the situation are correct, it follows necessarily that in causing the arrest and imprisonment of the plaintiff the defendant acted without warrant of law, and the court was justified in instructing the jury that under the admitted facts of the case it was shown that the defendant had wrongfully caused the imprisonment of the plaintiff upon void process, and that the only question left for the consideration of the jury was that of the amount of damages to be awarded. The motion for new trial on behalf of the defendant is therefore overruled.

On behalf of plaintiff a new trial is asked substantially on the ground that the amount of damages awarded, to wit, the sum of $10, is wholly inadequate, and also on the ground that, in the course of the argument to the jury, counsel for the defendant referred to the good record of the defendant as an old soldier, and that during the trial one of the counsel, in talking with members of the jury during a recess in the trial, discussed the same subject; supporting the latter averment with affidavits of the plaintiff and three others. The court, from its observation of these parties during the trial, knows that they are not skilled in the use of the English language, and it is quite apparent that they could readily be mistaken in their understanding of remarks which they claim to have heard only casually while passing by the parties; and there is nothing in the motion for new trial calling for further consideration, except the question whether the amount awarded is so inadequate as to necessitate a new trial. I am free to say that the verdict would have been much more satisfactory to the court if the amount awarded had been a larger sum. The evidence clearly showed that the defendant acted in good faith in the premises, and is not liable to the charge of actual malice or intentional wrongdoing, although, in the judgment of the court, he greatly erred in his interpretation of the law governing his action as Indian agent. It is therefore a case, as the jury were instructed, wherein the damages awarded should be compensatory only. The evidence failed to disclose any special pecuniary loss of moment, and the principal item to be considered was the deprivation of his liberty for the space of nine days, and the effect this had, if any, upon his reputation and standing in his community. If the jury had awarded him from $50 to $100, the verdict would have been much more satisfactory to the court, but their conclusion was to award $10, and no more. If a new trial should be granted, I do not believe a verdict in excess of $100 would be awarded, and the cost and expense to the plaintiff of such trial would fully absorb the increased amount, leaving him no better off than he now is with the verdict as it stands; and, under such circumstances, it is better to avoid all further costs in the premises.

Plaintiff's motion for a new trial will therefore be also overruled, and judgment will be entered on the verdict rendered.